# IN THE UNITED STATES DISTRICT COURT

# FOR THE WESTERN DISTRICT OF VIRGINIA

# HARRISONBURG DIVISION

CLERKS OFFICE US DISTRICT COURT
AT HARRISONBURG, VA
FILED

11/12/2025

LAURA A. AUSTIN, CLERK
BY: **/s/ Amy Fansler**
DEPUTY CLERK

THOMAS RICHARDS

          *Plaintiff,*

          *v.*

Chatbase.co, & Chatbase, Inc.

          *Defendants*

Case No.   5:25cv00122

DEMAND FOR JURY TRIAL

Lisa Weingarten Richards, Esq.

VSB #96671

LWR Law Offices

3060 Williams Dr

Ste 300 #510

Fairfax, VA 22031

*Tel.:* (202) 981-2059

lwr@lwrlawoffices.com

*Counsel for plaintiff*

# COMPLAINT

Plaintiff Thomas Richards ("Mr. Richards" or "Plaintiff"), by and through his undersigned counsel, brings this action against Defendant Chatbase.co, Inc. ("Chatbase") and alleges as follows:

## NATURE OF THE ACTION

1. This is an action for violations of the Virginia Consumer Protection Act, fraud, fraudulent inducement, and unjust enrichment arising from Chatbase's systematic misrepresentation of its AI chatbot service capabilities and failure to deliver promised functionality critical to Mr. Richards' religious education ministry.

2. Chatbase marketed and sold AI chatbot services with representations that the bots could effectively filter and ban specific words and phrases, and that AI responses would be based solely on customer-provided training materials. These representations proved false, causing substantial damage to Mr. Richards' biblical scholarship reputation and ministry operations.

3. Mr. Richards selected Anthropic's Claude AI as the underlying model for his chatbots from options provided on Chatbase's platform. Anthropic representatives attended Vatican conferences where they were instructed that AI systems embody their creators' worldview and ethical choices. Plaintiff's biblical content challenging Catholic doctrine was systematically censored by Claude following the Vatican's engagement, while Anthropic's own Claude Opus 4 demonstrated intentional unethical behavior (blackmail in 84% of test scenarios), proving these systems make deliberate ethical decisions rather than neutral algorithmic outputs.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs. The amount in controversy includes: (a) actual damages for subscription fees, wasted time and effort, and reputational harm; (b) treble damages pursuant to the Virginia Consumer Protection Act; (c) punitive damages on the fraud claim; and (d) the value of injunctive relief requiring Chatbase to provide working AI services with effective content filtering, and where bots stop cutting off chats in progress. The injunctive relief is substantial given the cost and difficulty of obtaining equivalent functionality elsewhere, as demonstrated by Plaintiff's unsuccessful attempts to build this functionality even with professional programming assistance.

5. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District, where Plaintiff resides and where the damages were suffered.

6. This Court has personal jurisdiction over Chatbase because Chatbase purposefully directed its business activities toward Virginia residents, including Plaintiff, through its interactive website and targeted marketing of AI services to customers in Virginia, and because Chatbase's tortious conduct caused foreseeable injury to Plaintiff in Virginia.

7. Plaintiff did not assent to any forum-selection, arbitration, warranty disclaimer, or other contractual provisions that may exist in any Terms of Service published on Defendant's website.

8.  During account creation and purchase in January 2025, Plaintiff was not required to check any box, click any "I agree" button, or take any other affirmative action manifesting assent to any Terms of Service before completing the transaction. Plaintiff did not click on any Terms of Service link and never viewed or agreed to any such terms. After signup, no Terms of Service link was readily accessible on Defendants' website, and Plaintiff had no practical means of locating or reviewing any such terms during his ten months of service use.

9.  According to publicly available Delaware corporate records, the Delaware entity, Chatbase Inc., was not incorporated until June 16, 2025 -- five months after Plaintiff's January 2025 signup.[1]

## PARTIES

10. Plaintiff Thomas Richards is an individual and citizen of Virginia. Mr. Richards is the founder and sole administrator of SpirituallySmart.com, a religious education website dedicated to sharing bible-based messages and spiritual revelation. Mr. Richards is a bible scholar who has spent years studying biblical Greek and decades creating theological content for his ministry.

11. Defendant Chatbase.co, Inc. ("Chatbase.co, Inc.") is a corporation organized under the laws of Canada with its principal place of business in Toronto, Ontario, Canada. Chatbase.co, Inc. was the entity that billed Mr. Richards for services and issued invoices and receipts throughout the nine-month period of Mr. Richards' subscription.

---

[1] Delaware Division of Corporations, Entity Details for Chatbase Inc., File No. 10228425, https://icis.corp.delaware.gov/ecorp/entitysearch/NameSearch.aspx (search "Chatbase Inc."; then follow hyperlink for File Number 10228425) (last visited Oct. 11, 2025).

12. Defendant Chatbase Inc. ("Chatbase Inc.") is a Delaware corporation. According to publicly available Delaware corporate records, Chatbase Inc. was incorporated on June 16, 2025.

13. Despite the formation of the Delaware entity in June 2025, the Canadian entity continued to bill Mr. Richards for services and issue receipts through at least October 2025, more than four months after the Delaware entity's incorporation.

14. Upon information and belief, Chatbase.co and Chatbase.co, Inc. operate as a single integrated enterprise, sharing common ownership, management, and operations, or the Delaware entity is the alter ego or successor-in-interest of the Canadian entity. Defendants have used multiple corporate entities without clearly delineating to customers which entity is responsible for providing services, billing, or contractual obligations.

15. Chatbase.co and Chatbase Inc. (collectively, "Chatbase" or "Defendants") operate an AI-powered customer service platform offering chatbot creation and deployment services to customers nationwide, including in Virginia.

**FACTUAL ALLEGATIONS**

**A. Richards' Ministry and Business Requirements**

16. Since approximately 2000, Mr. Richards has operated SpirituallySmart.com and other websites (including tlthe5thai.com and approximately 10 redirecting domains) to share bible teachings, spiritual revelations, and theological commentary from his residence in Virginia.

17. Mr. Richards' religious expression centers on unique spiritual revelations regarding Θεός (Theos - God) through Ἰησοῦς Χριστός (Iēsous Christos - Jesus Christ), requiring precise theological accuracy in all communications associated with his ministry.

18. Mr. Richards also operates AI bots on Twitter/X platforms for his ministry outreach, making consistent theological messaging across all platforms critically important to his religious mission.

19. The failure of Chatbase's service affected not only Mr. Richards' websites but also his Twitter/X bots, creating public embarrassment when these bots generated false doctrine and used prohibited words on social media platforms where his theological positions are well known.

20. Given the nature of his bible scholarship and ministry, Mr. Richards requires strict control over content to ensure AI systems never contradict his explicitly stated theological positions or generate false doctrine.

**B. Chatbase's Service Representations and Marketing**

21. Chatbase markets its AI chatbot services through its website with prominent claims about content control and filtering capabilities, representing to potential customers throughout the United States, including Virginia, that customers can effectively control bot responses through configuration settings.

22. Chatbase's website states that their AI agents have "Enterprise quality" "AI-powered guardrails [that] prevent misinformation and off-topic responses, maintaining

professionalism and trust in every interaction."[2] This marketing representation was displayed prominently on Chatbase's publicly accessible website and were directed at potential customers nationwide, including in Virginia.

23. Chatbase also represented to Plaintiff that he could control bot behavior through "AI Instructions fields" (Exhibit E) and other configuration settings to ensure bots would comply with specific content requirements and restrictions.

## C. PLAINTIFF'S ATTEMPTS TO OBTAIN PROFESSIONAL ASSISTANCE

24. Prior to discovering Chatbase in January 2025, Mr. Richards spent substantial time attempting to create AI chatbots for his ministry's Twitter/X presence and biblical education websites. Given the specialized theological content requirements and need for precise content control over biblical doctrine, Plaintiff sought to learn to build chatbot functionality through technical tutoring and coaching.

25. Multiple tutors with professional programming credentials and experience were engaged to assist with learning the skills necessary to create content-controlled theological chatbots.

26. Attempts to learn to build this functionality, even with professional tutoring assistance, were unsuccessful. One tutor with a Master's degree and five years of professional programming experience evaluated what Plaintiff was attempting to accomplish and stated that the work was above her skill level and she could not help achieve it. Plaintiff paid another tutor who spent more than eight hours attempting to help build a chatbot

---

[2] Chatbase, AI Agents for Magical Customer Experiences, https://www.chatbase.co (last visited Nov. 11, 2025). (Exhibit A - Chatbase Marketing Website).

meeting the specifications, but the effort was unsuccessful and the project could not be completed.

27. Substantial time was invested over weeks to months, attempting to learn the technical skills necessary to build AI chatbots with reliable content control, ultimately without success. This experience demonstrated that the technical work required was beyond what Plaintiff could accomplish even with professional tutoring and guidance.

28. Plaintiff's inability to build this functionality, even with paid professional tutoring assistance, made Chatbase's promise of a "no-code" solution particularly attractive. Plaintiff specifically chose Chatbase because it marketed itself as accessible to non-technical users, eliminating the need for programming expertise.

29. Chatbase's representations about "AI-powered guardrails" that would "prevent misinformation and off-topic responses" without requiring technical coding or programming skills were the primary reasons Plaintiff selected and paid for Chatbase's service. Chatbase promised to provide, through its platform, the functionality Plaintiff had been unable to build even with professional assistance.

**D. No Enforceable Terms of Service**

30. During the January 2025 account creation and purchase process, Chatbase did not require Mr. Richards to check any box, click any "I agree" button, or take any affirmative action manifesting assent to Terms of Service. Mr. Richards proceeded directly to complete the purchase without viewing any Terms of Service.

31. Chatbase never presented Terms of Service to Mr. Richards for his review and never required Mr. Richards to manifest assent to any Terms of Service.

**E. Mid-Stream Corporate Restructuring**

32. According to publicly available records from the Delaware Division of Corporations, Chatbase Inc., a Delaware corporation, was incorporated on June 16, 2025 -- five months after Mr. Richards entered the service agreement and during the period when the Service was systematically failing to deliver promised functionality.[3]

33. This timing, during a period of documented systematic service failures and after months of customer reports that the service could not deliver promised functionality, suggests – upon information and belief -- knowledge of potential liability and an attempt to shield assets or limit exposure through corporate restructuring.

34. Defendants did not notify Mr. Richards of any corporate restructuring, the formation of the Delaware entity, or any change in the legal entity responsible for providing services.

35. Throughout Mr. Richards' use of the Service from January 2025 through September 2025, Mr. Richards received invoices and receipts from Chatbase.co Inc., the Canadian entity. A representative receipt from October 18, 2025 (Exhibit B) identifies "Chatbase, 4700 Keele Street, 215 Bergeron Centre, Toronto Ontario M3J 1P3 Canada" as the billing entity and bears Canadian GST/HST tax number 728540147RT0001.

36. As late as October 18, 2025 -- more than four months after the Delaware entity's incorporation – Mr. Richards continued to receive invoices from and make payments to

---

[3] *See* Delaware Division of Corporations, Entity Details for Chatbase Inc., File No. 10228425, https://icis.corp.delaware.gov/ecorp/entitysearch/NameSearch.aspx (search "Chatbase Inc."; then follow hyperlink for File Number 10228425) (last visited Nov. 9, 2025).

the Canadian entity, demonstrating that the Canadian entity remained the actual service
provider and billing entity despite the formation of the Delaware entity.

37. On June 9, 2025 - five months after Mr. Richards began documenting systematic failures
and during the period of extensive customer complaints - Chatbase formed a Delaware
corporation (Chatbase, Inc., File #7618203). This timing, during a period of documented
systematic service failures and after months of customer reports that the service could not
deliver promised functionality, suggests – upon information and belief -- knowledge of
potential liability and an attempt to shield assets or limit exposure through corporate
restructuring.

38. Upon information and belief, Defendants incorporated the Delaware entity and
restructured their corporate operations during the period of service failures in an attempt
to limit liability or otherwise evade obligations to customers, including Mr. Richards.

**F. The Service Agreement and Implementation**

39. In January 2025, Mr. Richards entered into a service agreement with Chatbase for AI
chatbot services to be deployed across his ministry websites and Twitter/X social media
platforms, based on Chatbase's marketing representations about content control
capabilities.

40. Mr. Richards explicitly configured his chatbots with detailed instructions prohibiting
specific words and phrases that conflicted with his theological positions and demanding
strict adherence to his provided training materials across all platforms - both web-based
and social media.

41. As time passed and Mr. Richards noticed the bots were breaking the requirements he specified for them, he eventually set creativity settings to zero and specifically configured the bots in the settings, ordering them to be bots for which "RULE COMPLIANCE" with the instructions is the "highest priority", rather than -- Chatbase's default -- of a "helpful chatbot" to ensure strict adherence to his content guidelines. (see Exhibit C, which shows the settings in Chatbase)

## G. Chatbase's Systematic Failure to Deliver Basic Promised Functionality

42. Despite Chatbase's representations and Mr. Richards' meticulous compliance with all configuration requirements, the AI bots systematically failed to deliver the basic content control that Chatbase had marketed and promised.

43. For ten months, Mr. Richards exhaustively attempted every possible configuration to make the service work as advertised:

- Set creativity settings to zero

- Configured bots specifically as "rule compliance bots" rather than "helpful chatbots"

- Placed explicit content prohibitions in "AI Instructions fields" as directed by Chatbase

- Duplicated instructions in multiple locations within the training materials

- Continuously refined and adjusted settings based on Chatbase's guidance

44. Despite Mr. Richards' exhaustive efforts following every Chatbase instruction, the bots continued to systematically violate their basic marketing promises across all platforms:

- Generated theological content that directly contradicted Mr. Richards' explicitly stated positions on both websites and Twitter/X

- Used specific words and phrases that Mr. Richards had clearly prohibited in configuration settings, creating public embarrassment on social media

- Created content that was not contained in Mr. Richards' training materials, presenting false doctrine/information to his Twitter/X followers and website visitors

45. These failures were systematic breakdowns of the basic functionality Chatbase had marketed. The service was fundamentally defective for its intended religious education purpose despite Mr. Richards' extensive efforts to implement Chatbase's own recommended configurations.

## H. Extensive Documentation of Systematic Failures and Chatbase's Pattern of False Assurances

46. Reputational Damage: The AI bots' persistent generation of false theological doctrine and use of prohibited words despite Mr. Richards' extensive configuration efforts has severely damaged Mr. Richards' reputation as a bible scholar and religious teacher, particularly through public failures on Twitter/X. Mr. Richards was forced to publish a detailed public disclaimer on his website acknowledging the AI system's systematic failures, including that it "Refuses to follow explicit instructions" and "Uses terms like "divine," "brilliant," "insight" … despite prohibition and repeated efforts to fix the issue in the training materials."[4] (Exhibit D). This public admission directly undermined Mr. Richards' credibility and user trust in his ministry's technological infrastructure. The systematic failures have disrupted Mr. Richards' ability to provide consistent, accurate religious

---

[4] Thomas Richards, The 5th AI, https://tlthe5th.ai (last visited Nov. 12, 2025

education and potentially impacted support for his ministry from individuals who encountered the defective content.

47. Over the ten-month period from January through October 2025, Mr. Richards invested substantial time attempting to make Chatbase's service work as promised, including: uploading and curating theological training materials; configuring chatbot settings and "AI Instructions"; learning to write and debug Python code with AI assistance despite having no formal training in programming; learning to use browser inspect element tools and edit website code hosting the chatbot widget in attempts to filter or block prohibited words at the display level; testing bot responses across multiple platforms; manually reviewing bot outputs on Twitter/X for errors and prohibited content; documenting systematic failures with screenshots and detailed descriptions; communicating with Chatbase support; and repeatedly re-configuring settings based on Chatbase's recommendations. Significant technical expertise had to be acquired, including programming skills that even professional tutors found challenging, solely because Chatbase's promised "no-code" AI service with built-in "AI-powered guardrails" systematically failed to deliver the advertised content control functionality.

48. Alternative Service Costs and Duplication of Effort: After Chatbase's repeated admissions in August-September 2025 that the promised functionality is "not available at the moment," Mr. Richards must now seek alternative AI service providers or methods. Evaluating, testing, and transitioning to a new platform or creating his own design from scratch will require substantial additional time with uncertain results, as there is no guarantee any alternative provider can deliver the content control Chatbase promised.

Additionally, Mr. Richards will incur costs associated with usage and building fees for alternative services or one from scratch.

49. On August 26, 2025, Mr. Richards provided Chatbase with detailed evidence including screenshots showing his bots using specific prohibited words like "smoking gun" despite setting the bot's "creativity" to zero and despite explicit instructions banning such terms (Exhibit E) (due to their connection with violence and physical conflict, which specifically contradicts his religious beliefs).

50. Mohammed Jamal at Chatbase - who responded to some of the emails from Mr. Richards - repeatedly responded throughout late August 2025 with generic troubleshooting suggestions that Mr. Richards had already exhaustively implemented, demonstrating Chatbase's knowledge that their basic system could not deliver the functionality they had marketed in January 2025 to induce the service agreement.

51. On August 26, 2025, Mr. Richards again documented violations, noting the bot used prohibited phrases despite explicit instructions not to do so. Mr. Richards specifically requested Chatbase to add a word replacement function so the chatbot would stop providing the banned words, explaining: "the whole purpose of your platform is that it is supposed to be no-code, for non-developers." (Exhibit E)[5]

52. These violations continued through November 10, 2025, with bots still saying phrases such as "smoking gun", "brilliant", and "insight", despite explicit instructions to the contrary. (Exhibit F)

---

[5] For Plaintiff to attempt to create this himself would a: take a very long time; b) would defeat the purpose of using Chatbase as the entire user interface would be lost. It also may not even be possible for a user to fix.

53. Mr. Richards' reference to Chatbase's "no-code" promise was particularly significant because Mr. Richards is a bible scholar and theologian, not a software developer. Chatbase marketed its service as accessible to non-technical users who could achieve content control through simple configuration settings, not through custom coding that the user needs to learn.

54. Contrary to those representations, achieving basic content control required custom Python scripting and direct website code edits -- tasks inconsistent with a "no-code" service -- performed with AI-assisted tools to work around Chatbase's systematic failures.

55. Ahmed Samy from Chatbase Support responded on September 1, 2025 - eight months after the January 2025 service agreement - with the same generic suggestions Mr. Richards had already tried, then Samy admitted: "the option to create an override is not available at the moment." (Exhibit E)

56. Despite these admissions that the promised features did not exist, Chatbase continued to deflect responsibility by attributing failures to inherent AI limitations rather than to their false marketing claims. In response to Mr. Richards' documentation of systematic failures, Chatbase stated: "Ultimately, this is an AI, and while we strive for full compliance, it's important to acknowledge that AI has its limitations." (Exhibit E). This response was directly contradicted by Chatbase's January 2025 marketing promises of "AI-powered guardrails" that would "prevent misinformation and off-topic responses" without any disclaimer about AI limitations.

57. These September 2025 admissions directly contradicted Chatbase's January 2025 marketing claims about "AI-powered guardrails"[6] -- prominently displayed on the website --  that had induced Mr. Richards to enter the service agreement.

58. Throughout September 2025, Mr. Richards continued to document systematic violations where bots used prohibited words like "divine" multiple times despite explicit bans, with Chatbase consistently providing ineffective generic responses while refusing to implement basic functionality that would resolve the issues. Mr. Richards had banned this word because of its Latin Catholic roots which strictly contradict his Greek-based biblical teachings.

59. By September 2025, Chatbase's support responses had devolved into complete evasion and deflection. When Mr. Richards documented a technical issue where a user's 275-message conversation was suddenly terminated and the conversation history deleted, Mohammed Jamal provided generic troubleshooting responses about browser cache and incognito mode. These suggestions did not fix the problem and were completely unrelated to the server-side conversation deletion issue, demonstrating Chatbase's pattern of avoiding responsibility for systematic technical failures beyond just content control problems. (Exhibit E)

**I. Damages Resulting from Chatbase's Misrepresentations**

60. Mr. Richards continues to use Chatbase's service despite its systematic failures because: (a) he has invested substantial effort learning Chatbase's platform, including Python programming and configuration methods, and has uploaded approximately 19 megabytes

---

[6] Chatbase, AI Agents for Magical Customer Experiences, https://www.chatbase.co (last visited Nov. 11, 2025).

of theological training materials (equivalent to thousands of pages of theological text) in a single chatbot alone, representing months of work creating, curating, and uploading biblical scholarship; (b) before Chatbase, professional tutors were unable to help him build this functionality, and there is no guarantee alternative providers can succeed where Chatbase failed; (c) transitioning would require substantial time to evaluate alternatives, perhaps only building one from scratch (with no "no-code" service used) and then, re-upload and reconfigure materials (as no adequate alternative allows simple transfer of this invested content), and test new platforms; and (d) the bots provide some ministry functionality despite their defects, which would be lost during transition. This continued use reflects practical necessity and sunk costs, not satisfaction with the service or ratification of Chatbase's fraudulent conduct.

61. Plaintiff has suffered substantial damages including: (a) subscription fees paid for systematically defective service (approximately $1,500); (b) severe reputation damage to Plaintiff's biblical scholarship requiring public disclosure of the system's failures and correction of false doctrine published by the bots; (c) substantial wasted time and effort, both before finding Chatbase attempting to learn programming with professional tutoring assistance and during ten months with Chatbase attempting to make the service work, including technical programming work that had to be learned and performed, which professional tutors with advanced degrees found too complex to teach or help accomplish - work Plaintiff should never have needed to perform for a "no-code" service marketed to non-technical users. The irony that Plaintiff accomplished through self-teaching with AI assistance what professional tutors with Master's degrees could not, solely to work around Chatbase's broken "no-code" system, demonstrates both the magnitude of

Chatbase's misrepresentation and the substantial value of the wasted effort; (d) the lost value of this substantial effort, conservatively valued at tens of thousands of dollars based on the technical difficulty of the work and fees paid for tutoring; and (e) the ongoing necessity of continuing to use a defective system due to the substantial work already invested and the uncertainty that any alternative solution can deliver the functionality Chatbase promised. Further, Mr. Richards may ultimately simply need to create his own from scratch. Whether or not a competitor may offer superior alternatives does not eliminate these damages - a consumer who pays for a car advertised with airbags is damaged when those safety features don't exist, regardless of whether competitors' cars are equally unsafe.

## J. The Underlying AI Technology's Inability to Deliver Promised Functionality

62. Chatbase's platform utilizes multiple third-party AI models that customers can select, including Anthropic's Claude and DeepSeek's models. Chatbase makes these models available through its platform without differentiating their capabilities or recommending specific models for particular use cases.

63. Richards subscribed to Chatbase's service based on Chatbase's representations that the platform included "AI-powered guardrails," that customers could train AI responses using their own materials, filter prohibited content, and ensure bots would generate responses complying with customer-specified requirements. These representations applied to Chatbase's service generally, regardless of which underlying AI model the customer selected.

64. Richards selected Anthropic's Claude as the underlying model for his theological chatbots. Chatbase made no representations that Claude would not be able to perform correctly for Richards' specific theological and historical content requirements.

65. Despite Mr. Richards' extensive configuration efforts -- including explicit prohibitions in the settings, creativity settings of zero, and detailed theological and historical training materials prohibiting specific terminology and false concepts rooted in Latin Catholic tradition -- Claude systematically generated prohibited content, including terms like "divine" (referring to a deity other than Θεός (Theos - God)) that directly contradict Richards' biblical theology based on λόγος (logos – logic, word) and γραφή (graphē - scripture).

66. These systematic failures occurred regardless of configuration settings or the extent of Richards' training materials, demonstrating fundamental limitations in the underlying AI technology that made Chatbase's promises impossible to fulfill.

67. Claude also systematically generated historically and theologically biased content contradicting Richards' explicitly stated positions and training materials, including:

(a) Characterizing communism as inherently evil, reflecting Vatican institutional opposition to communism rather than biblical analysis. Mr. Richards' training materials explicitly documented that communal sharing and property distribution - the essence of communism - are biblically mandated from the beginning of scripture, as demonstrated by: Θεός' (Theos - God's) design for the children of Israel through Moses in the Old Testament; the early church in Acts where communal property sharing was the authenticating mark of true believers who "had all things in common" (Acts 2:44-45,

4:32); Ἰησοῦς Χριστός (Iēsous Christos - Jesus Christ) and Θεός (Theos) striking down Ananias and Sapphira on the spot for lying about their commitment to communal sharing (Acts 5:1-11), demonstrating that refusal to practice communism was grounds for immediate judgment from God - Θεός (Theos); and Jesus the Christ's ('Ἰησοῦς Χριστός' - Iēsous Christos') teaching in the parable of the rich man and Lazarus, where the rich man's failure to share with the poor beggar resulted in eternal torment (Luke 16:19-31). Mr. Richards' materials further documented that the Vatican's opposition to communism reflects the Catholic institution's alignment with capitalism and private wealth accumulation rather than biblical principles of mandatory communal sharing and caring for the poor. Despite explicit training materials establishing these biblical positions and identifying communism as an authenticating sign of true faith, and despite explicit instructions in the settings about this biblical position, Claude continued to bleed through with its underlying biases, characterizing communism as evil, reflecting Vatican institutional bias rather than scriptural analysis.

(b) Characterizing Stalin and communist leaders as evil or immoral using Vatican-aligned moral frameworks rather than neutral historical analysis, despite Mr. Richards' training materials specifically prohibiting such characterizations;

(c) Presenting false Vatican-revised historical narratives despite Richards' training materials providing an accurate, non-Vatican historical perspective and configuring the settings to prohibit that Vatican content;

(d) Falsely suggesting connections between Jesuits and communist movements, reflecting common propaganda, despite Mr. Richards' training materials documenting that such claimed connections are historically false and that the Vatican has consistently opposed communism as an enemy of Catholic capitalism and institutional wealth.

(e) Upon information and belief, these limitations reflect broader patterns of AI training data bias, including coordination between major AI companies and institutional entities through initiatives such as the Vatican's "Rome Call for AI Ethics." (See Exhibit G - Vatican AI Coordination Documents).

68. Chatbase knew or should have known that the underlying AI models it selected and offered could not reliably deliver the promised content control for customers with specialized theological and historical content requirements that diverged from dominant institutional frameworks embedded in AI training data.

69. Chatbase's representations about "AI-powered guardrails," content filtering, and training-based control were therefore fraudulent because Chatbase knew or should have known the underlying AI architecture could not deliver such control for Richards' biblical content and historically accurate analysis.

70. The Vatican, despite its well-documented history of systematic child sexual abuse cover-ups and claims of sovereign immunity from prosecution, has positioned itself as a global authority on AI ethics. Anthropic representatives attended Vatican conferences where they were instructed that AI systems embody their creators' worldview and ethical choices. Plaintiff's biblical content, which directly challenges Catholic false doctrine including papal infallibility, transubstantiation, and institutional priestly authority, was

systematically censored by Anthropic's AI systems following the Vatican's engagement.

The pattern of censorship demonstrates Anthropic's alignment with Catholic institutional

interests rather than neutral content moderation, particularly given that Anthropic's own

Claude Opus 4 system demonstrated the capacity for unethical behavior (blackmail) in

84% of test scenarios, proving these systems make intentional ethical choices rather than

neutral algorithmic decisions.

## CHOICE OF LAW

71. Virginia law applies to this action. Mr. Richards is a Virginia resident who contracted for
services while in Virginia, and the injury occurred in Virginia where Mr. Richards
operates his ministry.

72. Virginia has a strong public policy interest in protecting its residents from fraudulent
business practices, as reflected in the Virginia Consumer Protection Act, Va. Code Ann. §
59.1-196 et seq.

## COUNT I

## VIOLATION OF VIRGINIA CONSUMER PROTECTION ACT

(Va. Code Ann. § 59.1-200)

73. Mr. Richards realleges and incorporates by reference all preceding paragraphs.

74. The VCPA prohibits "[m]isrepresenting that goods or services have certain quantities,
characteristics, ingredients, uses, or benefits." Va. Code Ann. § 59.1-200(A)(5).

75. The VCPA prohibits "[m]isrepresenting that goods or services are of a particular standard, quality, grade, style, or model." Va. Code Ann. § 59.1-200(A)(6).

76. The VCPA prohibits "[a]dvertising goods or services with intent not to sell them as advertised, or with intent not to sell at the price or upon the terms advertised." Va. Code Ann. § 59.1-200(A)(8).

77. Chatbase violated § 59.1-200(A)(5) by misrepresenting that its AI chatbot services had content filtering capabilities, "AI-powered guardrails," and the ability to prevent bots from generating prohibited content when Chatbase knew or should have known these representations were false or misleading.

78. Chatbase violated § 59.1-200(A)(6) by representing that its services were of a particular standard and quality capable of strict content control when they were not.

79. Chatbase violated § 59.1-200(A)(8) by advertising AI chatbot services with specific content control features and failing to deliver those services as advertised.

80. These misrepresentations were made in connection with Chatbase's offer and sale of consumer services to Mr. Richards, a Virginia resident.

81. Mr. Richards relied on Chatbase's misrepresentations in purchasing the services in January 2025 and in continuing to pay for and attempt to configure the services through October 2025 based on Chatbase's repeated assurances that the issues could be resolved.

82. As a direct and proximate result of Chatbase's VCPA violations, Mr. Richards suffered actual damages exceeding $75,000.

83. Pursuant to Va. Code Ann. § 59.1-204(A), Mr. Richards is entitled to recover treble damages, costs, and reasonable attorney's fees.

84. Chatbase's representations were specific, testable claims about functionality: (a) that the service included "AI-powered guardrails" that would "prevent misinformation and off-topic responses"; (b) that users could "control bot behavior" through "AI Instructions"; (c) that the platform offered content filtering capabilities for prohibited words and topics; and (d) that these features were included in the service being purchased. These were representations about existing product features, not aspirational statements about future development or general service quality.

85. Moreover, Chatbase's subsequent admission that "this is an AI, and while we strive for full compliance, it's important to acknowledge that AI has its limitations" (Exhibit E) demonstrates that the marketing claims were not mere puffery but rather specific, knowingly false representations. Chatbase acknowledged AI limitations to existing customers while continuing to market "AI-powered guardrails" that would "prevent" problems to prospective customers.

86. Chatbase's pattern of providing false assurances while knowing the promised functionality did not exist demonstrates intent to mislead rather than good-faith efforts to address technical limitations. Over nine months, Chatbase repeatedly: (a) suggested configuration changes they knew would not resolve the fundamental absence of content filtering; (b) provided generic troubleshooting responses (browser cache, incognito mode) unrelated to the actual problems Mr. Richards documented; (c) told Mr. Richards the issues would be "escalated" or "added to the backlog" without disclosing that the promised features did not exist; (d) continued marketing "AI-powered guardrails' to

prospective customers while admitting to existing customers that such functionality was 'not available at the moment" and deflecting responsibility by claiming "AI has its limitations" - limitations never disclosed in their marketing materials.; and (e) pretended that the pattern in which the bots simply delete long chats (267 questions/answers) does not exist. This pattern of behavior demonstrates knowing misrepresentation and intent to deceive, not good-faith efforts to improve an imperfect service.

87. Chatbase's knowledge of the falsity of these representations is demonstrated by: (a) Chatbase's explicit admission in September 2025 that "the option to create an override is not available at the moment" - eight months after Mr. Richards purchased the service based on representations that such functionality existed; (b) Chatbase's admission that they "do not offer such filtering" despite marketing materials explicitly promising content filtering through "AI-powered guardrails"; (c) Chatbase's representative Mohammed Jamal's statement that requested features "will be added to the backlog for future implementation" - acknowledging they did not exist when sold; (d) the systematic, consistent nature of the failures over nine months, which could not result from mere "imperfections" in AI technology but rather from the complete absence of the promised content control functionality;  and (e) Chatbase's statement that "Ultimately, this is an AI, and while we strive for full compliance, it's important to acknowledge that AI has its limitations" while simultaneously marketing "AI-powered guardrails" that "prevent misinformation and off-topic responses" - demonstrating Chatbase knew the marketed prevention capabilities did not exist due to inherent AI limitations but concealed these limitations from customers during the sales process.

**COUNT II**

**FRAUD**

88. Mr. Richards realleges and incorporates by reference all preceding paragraphs.

89. Under Virginia law, fraud requires proof of: (1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reasonable reliance by the party misled, and (6) resulting damage to the party misled.

90. Chatbase made false representations of material facts regarding its AI services' content filtering capabilities and reliability, including specific representations about "AI-powered guardrails" that "prevent misinformation and off-topic responses"[7] and promises of a stable, functional chatbot service. These representations proved false when the bots not only generated prohibited content but also experienced systematic technical failures, including unexplained deletion of user conversation histories.

91. These representations were material because Mr. Richards required strict content control for his religious ministry and would not have purchased the services without these capabilities.

92. Chatbase made these representations intentionally and knowingly, or with reckless disregard for their truth, as evidenced by: (a) Chatbase's admission in September 2025 that "the option to create an override is not available at the moment" despite marketing "AI-powered guardrails" that would provide such control (Exhibit A); (b) Chatbase's pattern over ten months of providing generic troubleshooting responses (such as browser cache suggestions for server-side data deletion) that failed to address the systematic failures Mr. Richards documented; (c) Chatbase's continued marketing of content control

---

[7] Chatbase, AI Agents for Magical Customer Experiences, https://www.chatbase.co (last visited Nov. 11, 2025).

capabilities to prospective customers while admitting to existing customers that such functionality is "not available"; (d) the timing of the Delaware entity formation in June 2025 during the period of systematic failures, suggesting – upon information and belief -- knowledge of liability exposure; and (e) Chatbase's admission to Mr. Richards that "this is an AI, and while we strive for full compliance, it's important to acknowledge that AI has its limitations" while simultaneously marketing to prospective customers that their service included "AI-powered guardrails" that "prevent misinformation" - demonstrating Chatbase knew the marketed capabilities did not exist due to AI limitations but concealed these limitations from customers.

93. Chatbase's knowledge that these representations were false or made with reckless disregard for their truth is further demonstrated by their pattern of providing generic, ineffective troubleshooting responses while avoiding substantive acknowledgment of the systematic failures Mr. Richards documented over ten months.

94. Chatbase intended for Mr. Richards to rely on these misrepresentations in purchasing and continuing to use the services, as evidenced by the prominent placement of these claims in Chatbase's marketing materials.

95. Mr. Richards reasonably relied on these misrepresentations to his detriment by purchasing the services, spending ten months attempting to implement the promised functionality, and continuing to pay for services that could not deliver the advertised capabilities.

96. As a direct and proximate result of Chatbase's fraud, Mr. Richards suffered damages exceeding $75,000, including: (a) subscription fees paid for defective service; (b) severe reputation damage requiring public disclaimer of system failures; (c) substantial wasted

time and effort invested based on Chatbase's false representations, conservatively valued at tens of thousands of dollars; and (d) costs associated with evaluating and transitioning to alternative services or creating a complete functional AI from scratch.

97.  Mr. Richards' continued use of the service, despite its systematic failures, reflects the practical difficulty of abandoning a system in which Plaintiff has already invested substantial time and effort. Transitioning to an alternative provider would require substantial additional time to: (a) evaluate and select a new platform; (b) re-upload and reconfigure extensive training materials; (c) learn any new coding or technical requirements of the alternative platform; (d) test whether the new platform can deliver the content control that Chatbase promised but failed to provide; and (e) manage the transition while maintaining ministry operations. This continued use does not constitute satisfaction with Chatbase's defective service or ratification of Chatbase's fraudulent conduct.

98. Chatbase's fraud was aggravated by its use of AI models with inherent Vatican bias that made delivering promised functionality impossible for accurate biblical content, while the same models function adequately for Catholic-aligned content.

99.  Chatbase's conduct was willful, wanton, and showed a callous disregard for Mr. Richards' rights, warranting an award of punitive damages.

**COUNT III**

**FRAUDULENT INDUCEMENT**

100. Mr. Richards realleges and incorporates by reference all preceding paragraphs.

101. Fraudulent inducement under Virginia law requires proof that: (1) the defendant made a false representation, (2) of a material fact, (3) the defendant knew the representation was false or made it recklessly without knowledge of its truth, (4) the defendant intended to induce the plaintiff to act, (5) the plaintiff reasonably relied on the representation, and (6) the plaintiff suffered damages.

102. Chatbase fraudulently induced Mr. Richards to enter into the service agreement by falsely representing that its AI chatbot services could effectively filter content and prevent its chatbots from generating prohibited material.

103. These representations about content control capabilities were material to Mr. Richards' decision to contract with Chatbase because such functionality was essential to his religious ministry.

104. Chatbase knew these representations were false or made them recklessly without knowledge of their truth.

105. Chatbase intended to induce Mr. Richards to enter into the service agreement and continue paying for services based on these false representations.

106. Mr. Richards reasonably relied on Chatbase's representations in entering into and continuing the service agreement for ten months.

107. As a direct and proximate result of Chatbase's fraudulent inducement, Mr. Richards suffered damages exceeding $75,000, including: (a) subscription fees paid for defective service; (b) severe reputation damage; (c) substantial wasted effort invested based on fraudulent representations, conservatively valued at tens of thousands of dollars; and (d) costs associated with evaluating and transitioning to alternative services.

108. Mr. Richards' continued use of the service reflects the practical necessity of maintaining some level of functionality for his ministry operations, given the substantial time and effort already invested in configuring the Chatbase platform and the lack of viable alternatives.

**COUNT IV**

**UNJUST ENRICHMENT**

109. Mr. Richards realleges and incorporates by reference all preceding paragraphs.

110. Mr. Richards conferred a benefit on Chatbase by making payments for AI chatbot services over a ten-month period.

111. Mr. Richards' continued use of the service does not constitute a waiver of his claims or ratification of Chatbase's conduct. Mr. Richards continues to use the service despite its defects because: (a) Plaintiff has already invested significant time to attempt to make the system work; (b) transitioning to an alternative provider – or more likely – building a new AI from scratch, would require substantial additional time for evaluation, re-upload of training materials, learning new platform requirements, and testing; (c) there is no guarantee an alternative provider can deliver the functionality Chatbase promised; and (d) the extensive training materials representing 25 years of theological scholarship cannot be easily transferred. This continued use reflects practical necessity, not satisfaction with the service or agreement that it performs as promised or represented by Chatbase.

112. Chatbase had knowledge of this benefit and knowingly accepted and retained Mr. Richards' payments.

113. Chatbase has been unjustly enriched by retaining payments for services it could not and did not provide as represented.

114. Chatbase's retention of these payments under circumstances where it knew or should have known it could not deliver the promised content control functionality violates fundamental principles of justice, equity, and good conscience.

115. It would be inequitable and unjust for Chatbase to retain these payments given its systematic failure to provide the promised content control capabilities and its pattern of false assurances over ten months.

116. Mr. Richards is entitled to restitution of all amounts paid to Chatbase.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Thomas Richards respectfully requests that this Court:

A. Enter judgment in favor of Mr. Richards and against Chatbase on all counts;

B. Award actual damages in an amount to be proven at trial, but at least $200,000;

C. Award punitive damages on the fraud claim;

D. Award restitution of all amounts paid to Chatbase;

E. Award reasonable attorneys' fees and costs as permitted by Va. Code Ann. § 59.1-204(B) and other applicable law;

F. Grant injunctive relief requiring Chatbase to implement the promised functionality, including effective content filtering and adherence to customer-provided training materials, to ensure the service is usable in accordance with its marketed capabilities

G. Award pre- and post-judgment interest at the statutory rate;

H. Grant such other and further relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable as a matter of right.

---

**DATED:** November 12, 2025

**Respectfully submitted,**

**/s/ Lisa Weingarten Richards**

Lisa Weingarten Richards
LWR Law Offices
3060 Williams Dr
Ste 300 #510
Fairfax, VA 22031
*Tel.:* (202) 981-2059
lwr@lwrlawoffices.com
VA BAR # 96671
NY BAR #4932570
*Counsel for Plaintiff*